## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| APTARGROUP, INC., | |
| Plaintiff, | Civil Action No. |
| v. | **[REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED]** |
| KRAFT HEINZ FOODS COMPANY and THE KRAFT HEINZ COMPANY, | |
| Defendants. | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF[1]

Plaintiff AptarGroup, Inc. ("Aptar"), a Delaware corporation, by and through its attorneys, for its Complaint for Injunctive and Other Relief against Defendants Kraft Heinz Foods Company and The Kraft Heinz Company (collectively, "KHC"), hereby alleges as follows:

### INTRODUCTION

1.      This is an action for trade secret misappropriation and breach of contract to, *inter alia*, the snap-top closures on Heinz ketchup bottles.  Plaintiff Aptar is a leading global provider of a broad range of innovative packaging, dispensing and sealing solutions, primarily for the beauty, personal care, home care, prescription drug, consumer health care, injectables, food and beverage markets.  Aptar's creative packaging solutions enhance the convenience, safety and security of consumers around the globe and allow our customers to differentiate their products in the market.

2.      One focus of Aptar's business is the designing and manufacturing of dispensing systems which are featured in the packaging of consumer products.  Aptar's expertise is in the design and

---

[1]   Contemporaneously herewith, Aptar is filing a Motion for Leave to File Highly Confidential Trade Secrets and Related Information Under Seal.  The agreements upon which Aptar's breach of contract claims are based contain confidentiality provisions.  Aptar has redacted that information from the publicly filed version of the Complaint.

manufacture of technologically sophisticated closures.  Defendant KHC is a long time customer of Aptar's.  KHC has repeatedly relied on Aptar's in-stock portfolio of dispensing closures as well as its custom solutions to differentiate KHC's products from the others on the shelves and to provide the functionality and reliability that KHC's customers demand.  For example, in what KHC's predecessor the H.J. Heinz Company termed "a breakthrough in ketchup packaging,"[2] Aptar's technology enabled Heinz to package its ketchup and other products in inverted, top-down containers.  Heinz has attributed its high market share to Aptar's dispensing closures, stating that "[i]nnovations like Heinz Easy Squeeze Upside-Down Ketchup led Americans and Canadians to 'pour it on,' with ketchup market shares of 60% and 77%, respectively."[3]  Aptar has been providing innovative and high quality closures to its customers for decades.

3.      Aptar is a market leader in the highly competitive and price sensitive dispensing closures industry.  Aptar has invested hundreds of millions of dollars and decades of time in product innovation, materials sourcing, and manufacturing processes.  Aptar has likewise taken painstaking efforts to protect its position in the market by maintaining the secrecy of its confidential information.  Those efforts include entering into confidentiality agreements with its customers before supplying confidential information to collaborate with a customer.  A network of such agreements is in place with KHC.

4.      In blant violation of the law and with complete disregard for its confidentiality agreements with Aptar, KHC recently made the calculated decision to level the playing field between Aptar and its competitors, for the clear purpose of obtaining lower pricing on dispensing closures in an effort to cut costs.  KHC circulated a Request for Proposal ("RFP") on February 9,

---

[2]  H.J. Heinz Co., Annual Report (Form 10-K) (2002) at 24.

[3]  H.J. Heinz Co., Annual Report (Form 10-K) (2004) at 5.

2017 to Aptar, and upon information and belief, a dozen other closures suppliers, seeking pricing for a number of dispensing closures.  KHC provided product information in connection with its RFP, and in doing so, distributed Aptar's confidential information directly to Aptar's competitors, including ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

5.      KHC, upon being put on notice of its breach of its confidentiality obligations, refused to demand the return of Aptar confidential information.  Instead, KHC has threatened to complete its RFP process, thereby benefiting from its misappropriation by allowing Aptar's competitors to bid against Aptar with the benefit of Aptar's own confidential information.   Temporary and preliminary injunctive relief is required to prevent harm to Aptar as a result of this misappropriation.

6.      KHC effectively provided the blueprint to Aptar's business to Aptar's competitors, facilitating competition against Aptar in every segment in which Aptar sells dispensing closures. While Aptar developed its product specifications and manufacturing capabilities over decades through sustained investments in research and development, Aptar's competitors will be able to short circuit the entire process and replicate Aptar's products.

7.      In light of KHC's misappropriation of Aptar's information as well as its breach of its confidentiality obligations to Aptar, Aptar brings this Complaint for injunctive and other relief to preclude the misuse of its confidential, proprietary, and trade secret information and to obtain compensation for the damages it has suffered as a result of KHC's conduct.

## PARTIES

8.      Plaintiff AptarGroup, Inc. is a Delaware Corporation with its principal place of business in Crystal Lake, Illinois.  Aptar is a leading global provider of a broad range of innovative dispensing and sealing solutions in the food and beverage, beauty and home, and pharmaceutical markets. Aptar has 48 manufacturing facilities in North America, Europe, Asia, and South America, and nearly 13,000 employees.

9.      Defendant Kraft Heinz Foods Company is a Delaware Corporation with its principal place of business in Pittsburgh, Pennsylvania.  Kraft Foods Group, Inc. merged with the H.J. Heinz Holding Corporation in 2015, at which time the H.J. Heinz Company was renamed the Kraft Heinz Foods Company.  Kraft Heinz Foods Company is a wholly owned subsidiary of The Kraft Heinz Company.

10.     Defendant The Kraft Heinz Company is a Delaware Corporation with its principal place of business in Pittsburgh, Pennsylvania.  Kraft Foods Group, Inc. merged with the H.J. Heinz Holding Corporation in 2015, at which time the H.J. Heinz Holding Corporation was renamed The Kraft Heinz Company.

## JURISDICTION

11.     This court has federal question jurisdiction over Aptar's claim arising under the Defend Trade Secrets Act, §§ 1836-39 *et seq*., pursuant to 28 U.S.C. § 1331.  This court has supplemental jurisdiction over Aptar's state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because KHC resides in this Judicial District and a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this Judicial District.

## FACTUAL ALLEGATIONS

**A.  Aptar is a Market Leader in the Dispensing Closures Industry**

13.     Aptar has been designing, developing, and manufacturing dispensing closures for consumer products since the 1940s.  Today, Aptar has emerged as a market leader in the industry, with approximately 5,000 customers.  Aptar sells its dispensing closures to three segments: Food + Beverage; Beauty + Home; and Pharma.  Representative Aptar customers include Coca-Cola, Pepsi, and the Defendant, KHC.

14.     Aptar has achieved its position in the dispensing closures market by dedicating significant time and resources to research and development over several decades.  By way of example, Aptar invested over $200 million in research and development in the past three years alone.  Aptar expends such resources to continually refine new and existing products, materials, and manufacturing processes.   Aptar's investments in product development and manufacturing technologies have enabled Aptar to provide its customers with closures that increase product value through functionality, performance, and design differentiation.

15.     Aptar excels in the development of custom dispensing closures that meet its customers' needs.  In addition to its custom products, Aptar carries and sells stock dispensing closures.

16.     The market for dispensing closures is extremely competitive and price sensitive.  Aptar's competitive advantages in the market derive from its consistently high levels of product innovation, quality and reliable materials sourcing, and manufacturing expertise.  Aptar's product know-how, materials sourcing, manufacturing processes, cost structure, and pricing constitutes closely held confidential information.

**B.  Aptar's Dispensing Closures are Value-Added Components of KHC's Packaging**

17.     Aptar's dispensing closures have been a value-added component of Heinz's and Kraft's packaging for years.  Aptar's Snap Top dispensing closures appear on condiments, salad dressings, sauces, and liquid concentrates sold by KHC.

18.     Aptar's Snap Top dispensing closures are comprised of a body and a lid connected by a biased hinge.  A biased hinge acts as a spring to assist in opening and closing the lid and helps hold the lid open when in use.  These closures include a snap bead for closing and opening.  Snap Top dispensing closures affix to the accompanying container by either a threaded or snap-on closure.  Snap Top dispensing closures may be incorporated in upright or inverted product packaging.

19.     Certain Snap Top dispensing closures incorporate Aptar's SimpliSqueeze valve in the body of the closure, which is held in place by a retaining ring.  The purpose of the valve is to control the flow of the product from the container.  When pressure is applied to the container, the valve opens to dispense the product through the separated valve petals; when the pressure is removed, the valve petals close automatically to provide a seal.

20.     The plastic polymer material that is used to produce dispensing closures is referred to as a resin.  The selection of a resin is critical to the performance of the closure and requires a complete understanding of the product requirements, end use environment, and chemical compatibility.  Several varieties of resins are used to manufacture dispensing closures.  The most common resin that is used to manufacture dispensing closures is polypropylene.

21.     Additives are used to modify the characteristics of polypropylene to improve product performance and change the aesthetics of the part.  Additives include antistatic (or antistat) and colorant.  Antistatic is added to diffuse any static charge on the surface of the closure, so that the

closure does not attract dust and remains clean.  It also assists in the manufacturing process, facilitating ejection of the closure from the mold.  Colorant is produced by mixing pigments and/or dyes in specific proportions to give the desired color when blended with the base plastic.  Resin, antistatic and colorant change the performance of the plastic and closure and must be considered in the development process.  For example, the selected resin, antistatic, and colorant will affect valve performance, opening force, and hinge behavior.

22.    Aptar's product innovation is a result of its product design, selection of high quality materials, and tooling design.  For example, Aptar's technology ensures that the amount of force required to open the lid in a Snap Top closure is low enough for users to be able to open the closure, but high enough to keep the closure closed during transit, handling, and distribution.  Aptar's technology also boosts the strength of the hinge that connects the body of the closure to the lid, to minimize the potential for breakage when the closure is repeatedly opened and closed, dropped, or when the temperature of the closure fluctuates from the refrigerator to room temperature.  Additionally, Aptar's product design, tooling design, and manufacturing process ensures ideal plastic thickness throughout the closure.  Finally, Aptar's technology, such as its SimpliSqueeze valves, are designed to maximize the convenience of using a product by minimizing or eliminating product dripping and spills.  Aptar has also developed a valve that dispenses liquid concentrates at a high velocity, to facilitate the mixture of the concentrate with the liquid to which it is being added.

23.    Aptar's manufacturing strength lies in its ability to mold complex plastic and silicone components and to assemble products at high speeds and in a cost-effective manner.  When molding dispensing closures, Aptar employs advanced plastic injection molding technology, including large cavitation plastic injection molds.  Due in part to its extensive knowledge of plastic

behavior in mold, such as shrinkage, color, ejection, and mold flow, Aptar is able to mold within tolerances as small as one one-thousandth of an inch.

24.     Aptar's ability to deliver high performing products is the result of decades of experience designing, developing, and manufacturing dispensing closures.  Through thousands of iterations of trial and error, Aptar has identified the precise specifications that deliver the performance its customers demand at a competitive price point.

## C. KHC Has Repeatedly Agreed to Treat Aptar's Information as Confidential Under a Network of Agreements

25.     Given the economic value of Aptar's confidential information, Aptar has implemented comprehensive measures to protect its product know-how, materials, manufacturing methods, cost structure and pricing.   One such measure is Aptar's requirement that its customers execute confidentiality agreements.  Several such agreements govern the relationship between Aptar and KHC.  Aptar presently supplies dispensing closures to KHC pursuant to legacy Heinz and Kraft agreements.

### 1.  Legacy Heinz Agreements

26.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████  ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████Exh. 1 ████████

27.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████ Exh. 1 ██████

██   ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████

Exh. 2, ████████████████   █████████████████████████████

████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████

Exh. 2, ████████████████



Exh. 2,

Exh. 2, ██████████

██ ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████

██████████████████████████

██████████████████

██ ████████████████████████████████████

████████████████████████████████████████████

████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████ ██████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ ██

██████████████

29.  ████████████████████████████████████

████████████████████████████████████████████

---

[4] Seaquist Closures merged into Aptar.

████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

██████████

**2.  Legacy Kraft Agreements**

██   ████████████████████████████████████████████

██████████████████████   ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Exh. 3; Exh. 4; Exh. 5; Exh. 6. ████████

███████████



Exh. 3, ██████

██ ██████████████████████████████████████████

███████████████████████████████████████

Exh. 3, ██████

**D.  KHC Unlawfully Disclosed Aptar's Confidential Information to Aptar's Competitors**

35.    On February 9, 2017, KHC circulated a Request for Proposal ("RFP") to Aptar.  Upon information and belief, an identical RFP was distributed to Aptar's competitors. ████████

██████████████████████████

36.    KHC's RFP was accompanied by █████████████████████████

███████████████████████ ████████████████████

13

██████████████████████████████████████████████

████████████████████████████████████████████

37.     Aptar's engineering drawings are highly confidential.   Aptar's engineering drawings provide the information required to manufacture the dispensing closure therein to any party seeking to manufacture it.   As a general matter, Aptar does not provide its engineering drawings to its customers.   Aptar's engineering drawings are marked "Confidential" on their face, and are accompanied by the following (or substantively similar) language:

> Possession of this drawing is an acknowledgment that it and its contents are the exclusive property of Aptar.  The article shown on this drawing or the drawing may not be reproduced in any form whatsoever without written permission from Aptar.

KHC did not request permission to reproduce Aptar's engineering drawings, nor did Aptar grant the same.  Any such request would have been rejected outright.

38.     Aptar's customer drawings are also confidential.   Aptar's customer drawings are slightly less detailed versions of Aptar's engineering drawings and are made available to Aptar's customers upon request.   Although the customer drawings do not disclose as many measurements as engineering drawings, the customer drawings provide key measurements and tolerances that would give Aptar's competitors a head start in duplicating Aptar's closures.   Aptar's customer drawings are stamped with the following (or substantively similar) confidentiality language:

> Possession of this drawing is an acknowledgment that it and its contents are the exclusive property of Aptar.  This drawing may not be reproduced in any form whatsoever nor given to any third party without written permission from Aptar.

KHC did not request permission to reproduce Aptar's customer drawings, nor did Aptar grant the same.  Any such request would have been rejected outright.

39.     Engineering and customer drawings set forth detailed dimensions and measurements of Aptar's dispensing disclosures.   The disclosed dimensions are critical to the performance of the

closures, such as valve performance, opening force, and hinge behavior, as well as the fit of the closures to the container.  The dimensions listed in the engineering and customer drawings are specific to the one one-thousandth of an inch.

40.     The disclosed dimensions cannot be replicated by simply measuring Aptar's dispensing disclosures for several reasons.  It would be difficult, if not impossible, to accurately measure every dimension of an Aptar closure to the one one-thousandth of an inch.  Even minute inaccuracies (one-thousandth of an inch here or there) will affect the performance of the closure. Inaccuracies of this kind are unavoidable.  For example, some of the internal dimensions of the closure can only be taken by cutting the closure, which alters the dimensions in and of itself. Further, shrinkage, or the contraction of the closure, occurs as the closure cools during the manufacturing process.  The molding shrinkage ratio differs by component, geometry, and part thickness, and the exact ratios are unknown to Aptar's competitors.  Additionally, the dimensions of the closure as sold differ from the dimensions of the closures when molded.  Closures are molded open, then attached to a container and closed as part of the assembly process.  This process materially changes the dimensions of the closure such that the dimensions of a closure found in the store do not match the dimensions of the closure after molding.  Finally, some closures are "non-removable," requiring the effective destruction of the closure to remove it from the bottle.

41.     It would be extremely time consuming and expensive for a competitor to attempt to determine the measurements of Aptar's closures.  The competitor would have to create a model based on guesswork, build a mold from that model, manufacture a closure from the mold, test the closure, and repeat the process by modifying the model and creating a new mold based on the test results.  This process would be repeated continuously, with each new mold costing a significant amount and taking weeks to manufacture.  Even then, the competitor is unlikely to arrive at the

dimensions of Aptar's closures, for the reasons identified above.  As a result, dimensions to the thousandth of an inch could not be reverse engineered from Aptar's dispensing closures.

42.     KHC's RFP also contained ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ This information is likewise not susceptible to reverse engineering.

43.     Upon information and belief, KHC circulated Aptar's confidential information to some or all of the following closures suppliers, all of whom compete with Aptar: Berry Plastics, Formosa Plastics, Gateway Plastics, Global Closure Systems, Jabil Packaging Solutions, Pano Cap, Phoenix Closures, Plasticap, Selig, Silgan Plastics, and Weener Plastics Inc.

44.     On February 22, 2017—less than two weeks after KHC circulated the RFP—Aptar received a request for a quote from the Senior Program Manager of Food and Beverage Packaging at Jabil Packaging Solutions.  The Senior Program Manager requested pricing on an Aptar valve, writing:

> This opportunity is for the Heinz ketchup bottle cap.  We have been asked to quote the current design which I believe you already supply the valve?
>
> I have attached the drawing provide[d] by Heinz.

████████████████████████████████████████████████████████

████████████████████████ was sent to Jabil Packaging Solutions.

45.     Ironically, KHC's RFP was accompanied by the following language:

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████
████████████████████████████████████

46.    The ███ further stated ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████    The widespread breach of confidentiality in KHC's February

9 RFP is unprecedented in Aptar's nearly 80 years of doing business in the industry.   KHC's

February 9 RFP is unlike any that Aptar has received from Kraft or Heinz previously.   Prior RFPs

have consisted of one or two ornamental *designs*, with no detailed specifications, as compared to

KHC's February 9 RFP which contained ████████████████████████████████████████

47.    On February 17, 2017, within days of its receipt of the RFP, Aptar sent a letter to KHC

demanding that KHC (1) immediately cease all disclosure of any confidential and proprietary

Aptar information,  (2) notify such individuals or entities to whom such unauthorized disclosure

was made that they should not use such confidential information for any purpose whatsoever, (3)

require the return or destruction of all such materials from individuals or entities to whom

unauthorized disclosure was made and provide written certification of such return or destruction,

(4) identify to Aptar all recipients of Aptar's confidential information, and (5) confirm KHC's

intention to abide by its confidentiality obligations going forward.

48.    In a letter dated February 21, 2017, KHC stated that it would "look further into the matter"

upon Aptar's identification of "specifications and/or drawings included in the RFP [] of concern

to Aptar."   In response, Aptar provided KHC with a 6 page, non-exhaustive list of Aptar's

confidential information included in KHC's RFP in a letter sent on February 27, 2017.

49.     In its March 10, 2017 response, KHC denied having breached its confidentiality obligations, based on a frivolous assertion that KHC owns certain Aptar confidential information pursuant to the ███████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████

Exh.  2, ███████████████████████   ██████████████████   ████████

██████████████████████████████████████████████████████

██████████████████████   █████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████

Exh. 2, ██████████████████

50.     Apart from stating that it would "issue a letter upon the conclusion of all bidding activities requiring the return of, or certified destruction of, all information provided by KHC during the tender," KHC has refused to affirmatively address its blatant breach of confidentiality to Aptar.  In fact, by baselessly claiming ownership over Aptar's confidential information, KHC apparently believes it is entitled to continue to disseminate confidential information belonging to Aptar.

51.     Aptar has not responded to KHC's RFP as a result of KHC's breach.  If Aptar does not submit a bid, Aptar may not retain KHC's business after the expiration of its current agreements because of KHC's breach of its confidentiality obligations and its trade secret misappropriation.

52.     In the weeks following KHC's March 10, 2017 response, Aptar and KHC have had several in-person, business to business meetings, in attempts to reach a resolution which would include requiring that KHC demand the immediate return of Aptar's confidential information from RFP recipients.  KHC and Aptar have been unable to reach agreement on key terms.

53.     KHC's widespread dissemination of Aptar's confidential information threatens more than just Aptar's sales to KHC—it threatens Aptar's dispensing closures business across every segment in which Aptar competes.  For instance, the expertise embodied in the Aptar confidential and trade secret information provided to Aptar's competitors could be used by those competitors to compete against Aptar's business suppliers of condiments.

## E.  KHC's Widely Disseminated RFP Contains Confidential and Proprietary Information on Aptar's Products

54.     KHC's RFP disclosed ████████████████ concerning several Aptar dispensing closures, including five legacy Heinz products—the Thunderbird; 2 1/8" Classic Snap Top; 2 1/8" Snap Top, Nonremoveable; 43mm Nonremoveable Snap Top; and Ecolite Pour Spout—and five legacy Kraft products—the Genie; Jasmine; 2 1/8" Ultra Snap Top; 2 1/8" Snap Top, RediSpread; and Ultra Pour Spout, RediSpread.  KHC also disclosed a legacy Heinz and Kraft product—the Ultra Pour Spout.

55.     In addition to ████████████████████████████████
████████████████████████████████████████████
████████████████████████████

56.     Because the technology employed by Aptar is applicable from one closure to the next, KHC's dissemination of Aptar's information provides a blueprint to Aptar's entire dispensing closures product line.

1. **Legacy Heinz Products**

   a) **Thunderbird**



████████████████████████████████████████

███████████████████████████████

██  ████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

62.   ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████  ████████████████████  ██

████████████████████████████████████████

██████████████████████

      **b)    2 1/8" Classic Snap Top**

██  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

██  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████



███████████████████████  ██████████████████████████

███████████████████

    **c)**   **2 1/8" Snap Top, Nonremoveable**

██  ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

██  ████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

████████████████

████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████

██  ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████   ██████████████████████████████

████████████████████████████████████ .

71.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

72.   ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

    **d)**   **43mm Nonremoveable Snap Top**

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████



77.

███████████████████████████     ██████████████████████████████

████████████████████████ .

        **e)**    **Ecolite Pour Spout**

██    █████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████

██    █████████████████████████████████████

██████████████████████████████████████████████████████████

████████████   █████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████



██    █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██   ████████████████████████████████████████████████████

█████████████████████████

82.   ███   ██████████   █████████   ████████   █████████████   ███████   ██████   █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

2. **Legacy Kraft Products**

   a)   **Genie**

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████   ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████   ██████████████

█████████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

■   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

86.   ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

      **b)**   **Jasmine**

■   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████   ████████████████████   ██

███████████████████████████████████████████████████

■   █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

28

████████████████████████████████████████████████

■  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

90.  ████████████████████████████████████

      **c)**   **2 1/8" Ultra Snap Top**

■  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

■  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████



94. ████████████████████████████████████████████████

    **d)   2 1/8" Snap Top, RediSpread**

99.

e)   **Ultra Pour Spout, RediSpread**



104. ██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

### 3. Legacy Heinz and Kraft Product

#### a) Ultra Pour Spout



109.

**F. KHC's Disclosure of Aptar's Confidential and Proprietary Information has Irreparably Harmed Aptar**

110.   Aptar developed its confidential information at great expense through years of research, experimentation, and trial and error.  KHC deliberately exploited Aptar's confidential information to arm Aptar's competitors with the information they need to duplicate Aptar's products, to then shop the market for the lowest price.

111.   If KHC is not enjoined from its misappropriation and breach of contract, it will cause additional irreparable harm to Aptar.  Allowing the conduct to continue, and awarding monetary compensation after the fact, cannot unravel the harm caused to Aptar.

## COUNT I

### Violation of Federal Defend Trade Secrets Act
(18 U.S.C. § 1836)

112.   Aptar incorporates all of the above paragraphs as if fully restated herein.

113.   Aptar owns and possesses certain confidential, proprietary, and trade secret information, including scientific, technical, and engineering information and financial, business, and economic information, as alleged above.

114.   Aptar's trade secrets are reflected in the

34

115. Aptar's confidential, proprietary, and trade secret information relates to products used in, or intended for use in, interstate or foreign commerce.

116. Aptar has taken reasonable measures to keep such information secret. For example, access to confidential trade secret information within Aptar is restricted to designated personnel on a "need to know" basis, with only specified employees having access to databases housing Aptar's confidential information. All databases hosting Aptar's confidential information require passwords and dual-authentication for remote access. Aptar also restricts and controls physical access to its facilities.

117. Aptar also requires all employees, contractors, consultants, vendors, manufacturers, and customers to sign confidentiality agreements before any confidential trade secret information is disclosed to them. Aptar's employees additionally sign a Compliance Manual agreeing to maintain the confidentiality of all information entrusted to them by Aptar or by its suppliers and customers. In addition, Aptar aggressively polices compliance with employee confidentiality obligations, even to the point of bringing suit to enforce such obligations.

118. Aptar's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information. Aptar's confidential, proprietary, and trade secret information is developed by Aptar for its own use and is not available to Aptar's competitors.

119. KHC misappropriated Aptar's confidential, proprietary and trade secret information when it unlawfully disclosed Aptar's confidential information in connection with its RFP. KHC disclosed and used Aptar's trade secrets without express or implied consent by Aptar. At the time of its disclosure and use, KHC knew or had reason to know that its knowledge of Aptar's trade

secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Aptar's trade secrets was derived from or through a person who owed a duty to Aptar to maintain the secrecy of the trade secret or limit the use of the trade secret.

120.     As the direct and proximate result of KHC's conduct, Aptar has suffered and, if KHC's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.   Because Aptar's remedy at law is inadequate, Aptar seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.   Aptar operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

121.     KHC's misappropriation of Aptar's confidential, proprietary, and trade secret information was willful and malicious.  Aptar marked its confidential, proprietary, and trade secret information as confidential.   KHC intentionally removed Aptar's logos and confidentiality language from Aptar's engineering and customer drawings before sending them to Aptar's competitors as part of an RFP.

122.     Aptar has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

### COUNT II

**Violation of Pennsylvania Uniform Trade Secrets Act**
(12 Pa. Stat. and Cons. Stat. § 5301 *et seq.*)

123.     Aptar incorporates all of the above paragraphs as if fully restated herein.

124.    Aptar owns and possesses certain confidential, proprietary, and trade secret information, including formulas, drawings, patterns, compilations, programs, devices, methods, techniques, or processes, as alleged above.

125.    Aptar's trade secrets are reflected in the ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

126.    Aptar has made reasonable efforts to keep such information secret.  For example, access to confidential trade secret information within Aptar is restricted to designated personnel on a "need to know" basis, with only specified employees having access to databases housing Aptar's confidential information.   All databases hosting Aptar's confidential information require passwords and dual-authentication for remote access.  Aptar also restricts and controls physical access to its facilities.

127.    Aptar also requires all employees, contractors, consultants, vendors, manufacturers, and customers to sign confidentiality agreements before any confidential trade secret information is disclosed to them.  Aptar's employees additionally sign a Compliance Manual agreeing to maintain the confidentiality of all information entrusted to them by Aptar or by its suppliers and customers. In addition, Aptar aggressively polices compliance with employee confidentiality obligations, even to the point of bringing suit to enforce such obligations.

128.    Aptar's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use.  Aptar's confidential, proprietary, and trade secret information is developed by Aptar for its own use and is not available to Aptar's competitors.

129.    KHC misappropriated Aptar's confidential, proprietary and trade secret information when it unlawfully disclosed Aptar's confidential information in connection with its RFP.  KHC disclosed and used Aptar's trade secrets without express or implied consent by Aptar.  At the time of its disclosure and use, KHC knew or had reason to know that its knowledge of Aptar's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Aptar's trade secrets was derived from or through a person who owed a duty to Aptar to maintain the secrecy of the trade secret or limit the use of the trade secret.

130.    As the direct and proximate result of KHC's conduct, Aptar has suffered and, if KHC's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Aptar's remedy at law is inadequate, Aptar seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Aptar operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

131.    KHC's misappropriation of Aptar's confidential, proprietary, and trade secret information was willful and malicious.  Aptar marked its confidential, proprietary, and trade secret information as confidential.  KHC intentionally removed Aptar's logos and confidentiality language from

Aptar's engineering and customer drawings before sending them to Aptar's competitors as part of an RFP.

132.    Aptar has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

## COUNT III

### Violation of Illinois Trade Secrets Act
(765 Ill. Comp. Stat. 1065/1 *et seq.*)

133.    Aptar incorporates all of the above paragraphs as if fully restated herein.

134.    Aptar owns and possesses certain confidential, proprietary, and trade secret information, including technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, or financial data, as alleged above.

135.    Aptar's trade secrets are reflected in the ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

136.    Aptar has made reasonable efforts under the circumstances to maintain the secrecy or confidentiality of the confidential trade secrets.  For example, access to confidential trade secret information within Aptar is restricted to designated personnel on a "need to know" basis, with only specified employees having access to databases housing Aptar's confidential information.  All databases hosting Aptar's confidential information require passwords and dual-authentication for remote access.  Aptar also restricts and controls physical access to its facilities.

137.    Aptar also requires all employees, contractors, consultants, vendors, manufacturers, and customers to sign confidentiality agreements before any confidential trade secret information is disclosed to them.  Aptar's employees additionally sign a Compliance Manual agreeing to maintain the confidentiality of all information entrusted to them by Aptar or by its suppliers and customers. In addition, Aptar aggressively polices compliance with employee confidentiality obligations, even to the point of bringing suit to enforce such obligations.

138.    Aptar's confidential, proprietary, and trade secret information is sufficiently secret to derive independent economic value from not being generally known to other persons who can obtain economic value from its disclosure or use.  Aptar's confidential, proprietary, and trade secret information is developed by Aptar for its own use and is not available to Aptar's competitors.

139.    KHC misappropriated Aptar's confidential, proprietary and trade secret information when it unlawfully disclosed Aptar's confidential information in connection with its RFP.  KHC disclosed and used Aptar's trade secrets without express or implied consent by Aptar.  At the time of its disclosure and use, KHC knew or had reason to know that its knowledge of Aptar's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret, and that its knowledge of Aptar's trade secrets was derived from or through a person who owed a duty to Aptar to maintain the secrecy of the trade secret or limit the use of the trade secret.

140.    As the direct and proximate result of KHC's conduct, Aptar has suffered and, if KHC's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Aptar's remedy at law is inadequate, Aptar seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect

other legitimate business interests.   Aptar operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

141.    KHC's misappropriation of Aptar's confidential, proprietary, and trade secret information was willful and malicious.  Aptar marked its confidential, proprietary, and trade secret information as confidential.   KHC intentionally removed Aptar's logos and confidentiality language from Aptar's engineering and customer drawings before sending them to Aptar's competitors as part of an RFP.

142.    Aptar has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees.

### COUNT IV

**Breach of** ███████████████████████

143.    Aptar incorporates all of the above paragraphs as if fully restated herein.

███ █████████████████████████████

██████████████████████████

███ ████████████████████████

███ █████████████████████████████

███████████████████  ████████████████

████████████████████████████████

████████████████████████████████

███████████████████████

███ ████████████████████████

████████████████████████████████

█████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████   ████████████████

████████████████████████████████████████████████████

████████████████████████████████

██ ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

150.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████   ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

151.    As the direct and proximate result of KHC's conduct, Aptar has suffered and, if KHC's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Aptar's remedy at law is inadequate, Aptar seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect

other legitimate business interests.   Aptar operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

152.    Aptar is additionally entitled to damages flowing from KHC's material breach, and any other remedy available under law.

## COUNT V

### Breach of Legacy Kraft ████████

153.    Aptar incorporates all of the above paragraphs as if fully restated herein.

██   ████████████████████████████████

██████████████████████████████████

██   ███████████████████████

██   ████████████████████████████████

████████████████   ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████

██   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

██   ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████   ██████████████

████████████████████████████████████████████

███████████████████████████████████

███████████

159.    As the direct and proximate result of KHC's conduct, Aptar has suffered and, if KHC's conduct is not stopped, will continue to suffer severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Aptar's remedy at law is inadequate, Aptar seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Aptar operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

160.    Aptar is additionally entitled to damages flowing from KHC's material breach, and any other remedy available under law.

## PRAYER FOR RELIEF

WHEREFORE, Aptar respectfully requests the following relief:

a)  For a temporary restraining order, preliminary injunction, and permanent injunction ordering KHC to (1) cease all unauthorized disclosure of any Aptar confidential information; (2) identify to Aptar all unauthorized recipients of Aptar confidential information; and (3) notify such unauthorized recipients to effect the return or destruction of all Aptar confidential information, and further (4) enjoining KHC from obtaining any commercial benefit from its unlawful and unauthorized disclosure of Aptar confidential information;

b)  Judgment in Aptar's favor and against KHC on all causes of action alleged herein;

c)  For damages in an amount to be further proven at trial, including but not limited to compensatory, punitive, and exemplary damages;

d)  For attorneys' fees and costs;

e)  For restitution;

f)  For prejudgment interest;

g)  For such other and further relief as the Court may deem to be just and proper.

Date:  April 21, 2017

Respectfully submitted,

*/s/ Scott D. Livingston*
Scott D. Livingston (PA ID No. 62956)
livingston@marcus-shapira.com
Jonathan D. Marcus (PA ID No. 312829)
jmarcus@marcus-shapira.com
MARCUS & SHAPIRA LLP
One Oxford Centre, 35th Floor
301 Grant Street
Pittsburgh, PA  15219
Telephone: (412) 471-3490
Facsimile: (412) 391-8758

Stephen A. Swedlow
Nathan Hamstra
Michelle Schmit
(motions for *pro hac vice* admission to be filed)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 W. Madison Street, Suite 2450
Chicago, Illinois 60661-2510
(312) 705 7400

*Attorneys for Plaintiff*